UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:18-CR-39 |
| | ) | |
| vs. | ) | |
| | ) | |
| JAVIER LUIS TORRES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

Defendant, Javier Luis Torres ("Torres"), has filed a Motion to Suppress and Brief in Support [Doc. 31]. The United States filed a Response in Opposition and Brief in Support [Doc. 36]. This matter is before the Court pursuant to 28 U.S.C. 636(b) and the standing orders of the District Court for a Report and Recommendation.

On Wednesday, November 14, 2018, the Court conducted an evidentiary hearing on Defendant's motion. Present at the hearing were defendant, his counsel, and Assistant United States Attorney Meghan Gomez, Esq. Testifying at the hearing were Tennessee High Patrol ("THP") Troopers Sollie Rabun and William Conners. This matter is now ripe for resolution. For the reasons stated herein, the undersigned RECOMMENDS the Motion to Suppress be DENIED.

**I.  PROCEDURAL BACKGROUND**

On March 13, 2018, a federal grandy jury returned an indictment against Torres charging him with possessing with the intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) [Doc. 17]. On July 26, 2018, Torres filed a Motion to Suppress [Doc. 31] arguing that the traffic stop conducted by law enforcement violated the Fourth Amendment as it was "artificially and unreasonably prolonged" and alternatively that is was not

1

supported by reasonable suspicion. He claims all evidence obtained from the illegal seizure and subsequent search should be suppressed. The United States responds that the traffic stop was not unreasonably extended and that alternatively it was supported by reasonable suspicion based on the totality of the circumstances.

## II.     FINDINGS OF FACT

On February 15, 2018, Trooper Rabun, a member of the THP Interdiction Team, was stationed in the median of Interstate 40 near mile marker 411 with his K-9 partner Luke. From his position there, he observed a black Chevrolet Impala traveling eastbound on Interstate 40, going slower than the flow of traffic. As Trooper Rabun proceeded to follow and observe the Impala, he witnessed the Impala speeding and following too closely behind a tractor trailer. In response to these traffic violations, Trooper Rabun pulled behind the vehicle, activated his lights, and stopped the vehicle. As he approached the vehicle, Trooper Rabun noticed that the Impala had a Texas license plate. Trooper Rabun then made contact with the driver of the Impala, which was Javier Torres. When Trooper Rabun asked Torres for his license and registration, Torres stated that the car was a rental vehicle rented by his girlfriend but that he was an approved driver. He also stated that he could attempt to obtain a copy of the rental agreement from his girlfriend on his phone. Trooper Rabun asked where Torres was driving to, and Torres responded that he was going to New York for a funeral.

After running a check on Torres' license and registration, Trooper Rabun learned that while Torres did not have any outstanding warrants, he had crossed the border of Mexico sixty-eight times in the last year. Torres had most recently returned from Mexico six days before the stop. When Trooper Rabun returned to the vehicle to return Torres' license and vehicle registration,

2

Torres was able to produce a copy of the rental agreement that did show that his girlfriend rented the vehicle and that he was an approved driver.

After returning Torres' documents, Trooper Rabun asked if there was anything illegal in the vehicle. Torres responded that there was nothing illegal in the car. However, as he responded, he looked toward the passenger floorboard where there appeared to be a blanket and Victoria's Secret bag. When Trooper Rabun asked if he could search the car, Torres responded "No." Trooper Rabun asked if there was a reason that he would not allow the search if there was nothing illegal in the vehicle. Torres stated that he was a criminal justice major and did not want to be searched. Trooper Rabun then gave Torres a verbal warning to not follow too closely and that the recommended following distance was one car length per ten miles per hour. Trooper Rabun ended the traffic stop and returned to his vehicle.

After a short time, Torres pulled back onto Interstate 40 East. Trooper Rabun pulled out behind him and continued following Torres, remaining approximately twenty car lengths behind him. Several miles later, Trooper Rabun paced Torres going seventy miles per hour in a sixty-five miles per hour zone, which he confirmed with radar. Further ahead, at the interchange of Interstate 40 and 81, Torres chose to continue right onto Interstate 40 East toward North Carolina instead of straight onto Interstate 81 North toward Virginia, which appeared to Trooper Rabun to be contrary to the travel plans that Torres had previously shared. Trooper Rabun then called THP Trooper William Conners and his K-9 partner Laky for back up.

When Trooper Rabun then observed Torres again following too closely behind another tractor trailer truck, he closed the distance between them. Torres then made a sudden lane change, causing another vehicle to brake suddenly to avoid a collision. In consideration of Torres continuing to commit the same traffic violations, Trooper Rabun decided to effect another traffic

3

stop. At 10:38 a.m., he activated his lights, and Torres pulled over alongside a guardrail. Trooper Rabun indicated to Torres to pull beyond the guardrail onto the exit ramp near mile marker 435 for safety, and Torres did so.

At 10:41:25 a.m., Trooper Rabun motioned for Torres to exit the vehicle and join him at the rear of the vehicle. At 10:41:51, Torres exited the vehicle, rolling up the windows and locking the doors as he did so. Torres asked Trooper Rabun if there was a reason that he was pulled over. Trooper Rabun responded that he witnessed him commit more traffic violations and that he believed he had enough "reasonable suspicion" to detain him "a little longer" until his partner arrived to deploy his K-9. Trooper Rabun then inquired about Torres being a criminal justice student and his remaining time left in school. He also asked what area of New York Torres was heading to, to which Torres replied "the Bronx." He then asked how Torres normally gets to New York. Torres responded that he normally gets a rental car and takes "this route right here" "through Arkansas, Little Rock, Memphis" with Tennessee being the longest, Virginia, Pennsylvania, and "Jersey." Trooper Rabun then asked if Torres knew he was going in the wrong direction, toward North Carolina. Torres responded that his GPS was not working and that he was planning on stopping to get gas.

As Trooper Rabun then reiterated that he effected both traffic stops in response to Torres committing traffic violations, Trooper Conners arrived on the scene at 10:43:05. Trooper Conners and K-9 Laky approached the Impala at 10:43:58 a.m., approximately two minutes after Torres exited his vehicle. Trooper Rabun explained what K-9 Laky is trained to alert on. As he is doing so, at 10:44:20, the dog alerted on the front, passenger side of the vehicle by jumping up toward the car and then by sitting. Trooper Conners and K-9 Laky continued around the vehicle and Laky sat once more at the rear, passenger side of the vehicle. Trooper Rabun told Torres that the dog

4

alert gives them probable cause to search the vehicle. Around 10:45, Trooper Rabun placed Torres in the back of his patrol vehicle, and he and Trooper Conners began to search the Impala. In the front, passenger floorboard, under the blanket and some clothing, the Troopers found a cardboard box containing four vacuum-sealed packages that were found to contain approximately nine pounds of cocaine.

**III. ANALYSIS**

While both parties initially discuss Trooper Rabun's "reasonable suspicion" to extend the second traffic stop to allow for the dog sniff, the Court finds that if the traffic stop is not found to be extended, then that analysis is unnecessary. *See United States v. Gordon*, Crim. Case No. 17-20781, 2018 WL 2843277, at *8 (E.D. Mich. June 11, 2018) ("Thus, the dispositive issues here fall squarely within the *Rodriguez* line of precedent: was the stop prolonged to the point of requiring reasonable suspicion, and if so, was there a basis for reasonable suspicion."). Therefore, the Court will first address whether the traffic stop has been extended beyond the time needed to handle to the matter for which the stop was made.

The Supreme Court in *Rodriguez v. United States* held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 135 S. Ct. 1609, 1612 (2015). Therefore, a stop based on a traffic violation would become unlawful once it exceeds the time necessary to conduct "ordinary inquiries incident to [the traffic] stop," *id*. at 1615, and to issue a citation. *Id* at 1612. Typical inquiries may include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. at 1615. This may also include "context-framing questions" that "may help explain, or put into context," the driver's behavior. *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010) (quoting *United*

5

*States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001)); *see also United States v. Lujan*, Case No. 4:17-CR-37, 2018 WL 3742452, at *5 (E.D. Tenn. August 7, 2018). Questions related to safety of the officer are also "unquestionably permitted." *Lujan*, 2018 WL 3742452, at *5. The Court in *Rodriguez* also allows for "certain unrelated investigations" as long as they do not extend the stop. 135 S. Ct. at 1614. However, the officer's authority to seize the individual ends "when tasks tied to the traffic infraction are–or reasonably should have been–completed." *Id*.

In *Rodriguez*, the officer had issued the traffic citation but then held the defendant for over eight minutes until backup arrived and the stopping officer could use his K-9 to conduct a dog sniff on the vehicle. *Id.* at 1613. This made the Court's determination of whether the time of the stop exceeded the time needed to handle the matter of the stop straightforward. The officer had completed the purpose of the traffic stop by issuing the traffic ticket and any time after that prolonged the stop.

However, when presented with a less straightforward factual situation, "the *Rodriguez* rule is far easier to articulate than to apply." *Lujan*, 2018 WL 3742452, at *4 (quoting *United States v. Green*, No. 17-1576, 2018 WL 3559216, at *4 (3d Cir. July 25, 2018)). *Rodriguez* guides the Court to consider what the "officer actually did and how he did it." 135 S. Ct. at 1616. In considering the totality of the circumstances, the Court may contemplate not only the time it takes the officer to complete the actions directly related to the traffic stop but also may consider the "subject" and "quantity" of any unrelated questioning. *Lujan*, 2018 WL 3742452, at *5 (citing *Everett*, 601 F.3d at 494). While "some amount" of interrogatory questions unrelated to the stop are tolerated, "if the questions make up a *bulk* of the interaction between the trooper and motorist," the traffic stop may then be extended into another investigation. *Lujan*, 2018 WL 3742452, at *5 (quoting *Everett*, 601 F.3 at 495) (internal quotations omitted) (emphasis in original).

6

In this case, the time between Trooper Rabun making contact with Torres on the exit ramp and Trooper Conners beginning the "dog sniff" test was two minutes and seven seconds. While the measure of time is arbitrary in considering what constitutes promptness, it is what took place in those two minutes that is significant to the Court. *See Lujan*, 2018 WL 3742452, at *4; *Rodriguez*, 135 S. Ct. at 1616. After waving Torres to exit the vehicle, Trooper Rabun asks if Torres has any weapons on his person, to which Torres answers in the negative. He then indicates to Torres that he witnessed him commit additional traffic violations and that he now believed he had "reasonable suspicion" to justify "detain[ing] him for a little bit longer." They then discuss his schooling plans, with Trooper Rabun asking where Torres received his criminal justice degree from, and when Torres responds that he has not completed his degree yet, Trooper Rabun follows up asking how many credit hours he has earned so far. Torres volunteers personal details involving where he hoped to get a job and how he financed his education. Trooper Rabun then asks how much gas he had left, where exactly in New York he was heading, and how he normally traveled there. After Torres responds detailing his typical route, Trooper Rabun asks if he knew he was traveling in the wrong direction and then elaborates as to why he found that, as well as Torres continuing to commit the previously warned traffic violations, suspicious considering their conversation at the first traffic stop. By this time, Trooper Conners had arrived on scene and was walking K-9 Laky around the Impala.

Torres posits that Trooper Rabun did not need to run his license and registration again as he had just previously done so at the first stop and found both to be clean [Doc. 31, p. 11]. Therefore, he argues, the only action left to take when Trooper Rabun pulled him over the second time was to write a citation. *Id*. Instead, Trooper Rabun "diverted from the ordinary purpose of the traffic stop and began an unwarranted investigation into drug trafficking without reasonable

7

suspicion." *Id*. The United States argues that the "trooper was still investigating and had not decided what he wanted to do with the defendant." [Doc. 36, pg. 10].

Despite Trooper Rabun previously running Torres' license and registration, the stopping officer may inquire into issues related to the traffic stop. As the Court in *Lujan* notes, locomotion-related questions, such as questions about travel plans and history, are "acceptable in and of themselves" as related to the stop. 2018 WL 3742452, at *5 (citing *Everett*, 601 F.3d at 494). Trooper Rabun's questions concerning his reasons for stopping Torres again as well as asking about Torres' travel intentions and typical route fall into this category as related to the stop. Therefore, that time does not qualify as extending the stop.

The only unrelated line of questioning involves Torres' education. However, Trooper Rabun's two questions, totaling only twenty-five seconds, do not make up the "bulk of the interaction" between the two. *Lujan*, 2018 WL 3742452, at *5 (citing *Everett*, 601 F.3d at 495). While *Lujan* finds that the officer's brief, twenty second line of questioning did make up the "bulk" of the detention, that Court's decision was not based on time but rather the amount of unrelated questioning compared to the other traffic stop-related inquiries. Further, in *Lujan*, upon pulling the defendant over, the officer determined almost immediately that the temporary tag on the vehicle was proper and not in violation of any law, contrary to his reasoning for pulling the vehicle over. 2018 WL 3742452, at *5. At that point, "the reasonable suspicion supporting the stop had been satisfied," and yet the officer continued to question the defendant. *Id*. Here, in witnessing Torres continuing to speed and follow to close, the traffic violation had already been committed and was not in question. Subsequently, the main focus of the approximately two-minute conversation focused on the circumstances surrounding the traffic stop rather than Torres' education.

Therefore, the Court finds that Trooper Rabun did not extend the traffic stop during his conversation with Torres before the dog sniff occurred. At the time the dog arrived on the scene, the stop had not surpassed the time in which the "tasks tied to the traffic infraction [were]–or reasonably should have been–completed." *Rodriguez*, 135 S. Ct. at 1615. In waiting for the dog to arrive, the stop had not been extended under *Rodriguez*. Once the dog alerted on the vehicle, the officers then had probable cause to search the vehicle. *See Florida v. Harris*, 568 U.S. 237, 247 (2013) ("[A] court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."). Following the determination that the traffic stop was not extended, the Court finds an analysis of Trooper Rabun's "reasonable suspicion" of Torres to be moot.

## IV.  CONCLUSION

Because the undersigned finds that the traffic stop was not extended and was not otherwise in violation of the Fourth Amendment, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 31] be **DENIED** for the reasons outlined herein.[1]

Respectfully Submitted,

s/Clifton L. Corker
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be served and filed within **ten (10) days** after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).